IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Leo Jenkins, ) | Civil Action No. 6:13-2021-DCN-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on December 13, 2010, alleging that he became unable to work on June 1, 2009. The application was denied initially and on reconsideration by the Social Security Administration. On September 13, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Victor G. Alberigi, an impartial vocational expert

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared on June 5, 2012, considered the case *de novo* and, on June 14, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on May 20, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.
>
> (2)    The claimant has not engaged in substantial gainful activity since June 1, 2009, the alleges onset date (20 C.F.R § 404.1520(b) and 404.1571 *et seq*).
>
> (3)    The claimant had the following severe impairment: superficial spongiotic psoraiasiform dermatitis (20 C.F.R. § 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less that the full range of sedentary work work as defined in 20 C.F.R. § 404.1567(a).  Specifically, the claimant is able to lift up to 20 pounds occasionally and sit for 6 hours in an 8-hour day.  He is able to stand/walk up to 2 hours, occasionally use his lower extremities bilaterally for foot control, never climb ladders, ropes or scaffolds, occasionally climb ramps, stairs, and stoop, kneel, climb and crawl. He must avoid concentrated exposure to extreme heat, wetness and humidity and must avoid face-to-face contact with the general public.
>
> (6)    The claimant is capable of performing past relevant work as a telemarket[er].  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

2

> (7)     The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2009, through the date of this decision (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 56 years old on his alleged disability onset date and 59 years old on the date of the ALJ's decision. Treatment notes in the record indicate that the plaintiff had been treated for eczema for many years (Tr. 251-53). On October 6, 2006, the plaintiff saw Gerald Davis, M.D., for a flare of his skin condition (Tr. 253).

On January 6, 2010, the plaintiff was seen by Lee Yarborough, M.D., at Mount Pleasant Dermatology. The plaintiff reported that his skin condition was worsening and that he had an itchy rash all over his body (Tr. 218-19, 222-23). The plaintiff reported that he had a life-long history of eczema that had been active the past few years. He reported pain and "swollen glands" for three to four months. The plaintiff had already had two steroid injections and was using Triamcinolone (a corticosteroid cream). The plaintiff's wife reported that he had not been consistent with this treatment (Tr. 222). The doctor noted lichenified (i.e., thick and leathery) patches of skin, as well as multiple papules on the face, arms, legs, and back. The plaintiff was assessed with chronic contact or atopic dermatitis. He was prescribed Bactrim DS and Lidex cream. Several small biopsies were taken as well as photos (Tr. 224). On January 7, 2010, the plaintiff's biopsies were reviewed (Tr. 224). Impression was superficial spongiotic psoriasiform dermatitis. Histology suggested a subacute or chronic contact or atopic dermatitis. Dr. Yarborough reviewed the results and recommended that the plaintiff continue with his current plan.

The plaintiff visited Mount Pleasant Dermatology again on January 20, 2010. He reported that his eczema was improving and that he continued to use Aquaphor lotion and steroid cream. The provider noted soft, crusting skin, but no drainage. The provider noted that the plaintiff's lymphadenopathy (i.e., swelling of the lymph nodes) was improved. Blood work was ordered (Tr. 220-21).

On April 15, 2010, the plaintiff visited Emily Kmetz, M.D., at the Medical University of South Carolina ("MUSC") for a dermatology appointment (Tr. 230-31). Dr. Kmetz noted a long history of eczematous dermatitis that the plaintiff reported was worse in the past four-to-five months. The plaintiff reported that creams had not been effective in the past, but that he had not tried any treatment recently. He requested pain medication. The doctor assessed the plaintiff with an eczema flare and significant swelling of the lymph nodes (Tr. 230). The plaintiff had lichenified skin over his entire trunk and extremities, as well as several excoriations and a few eczematous papules and plaques. There was no evidence of infection. Dr. Kmetz assessed the plaintiff with severe atopic dermatitis (Tr. 230). The doctor noted that the plaintiff was "self pay" and that no "workup should be repeated unless necessary." Dr. Kmetz preferred not to prescribe the plaintiff steroids because he had recently been diagnosed with hypertension. The doctor noted that the plaintiff had been non-compliant with topical medication in the past and explained that consistency with this treatment was necessary to avoid use of systemic steroids (Tr. 230). Dr. Kmetz recommended soaking in plain water and applying steroidal ointment and over-the-counter moisturizer. Future treatment options included light therapy and immunomodulating medications. He was directed to return in two weeks. (Tr. 231)

On October 16, 2010, the plaintiff visited the MUSC Emergency Department complaining of eczema and leg swelling. The provider noted that the plaintiff had a history of atopic dermatitis and that he usually responded to steroids (Tr. 227). The plaintiff was given a Medrol Dose Pack, Lortab, and Nasonex and referred to the East Cooper Cares Clinic where he had been seen before. The plaintiff was discharged in stable condition (Tr. 228).

On November 4, 2010, the plaintiff returned to the MUSC Emergency Department complaining of numbness in his fingers (Tr. 225). He stated that he was

currently suffering no symptoms, but worried about a stroke. The provider noted severe eczema, 5/5 muscle strength, and no focal deficits (Tr. 225-26).

On January 27, 2011, the plaintiff was contacted by the State agency. He stated that he had suffered from eczema all his life, but that it had become debilitating over the past year. He stated that he looked very bad, and other people shied away from him. He had eczema all over his body, worse on his hands, feet and legs. His skin would peel and begin to drain about every two weeks. He had been treated with creams and steroids, but was taking neither at the time. He had used over-the-counter creams that helped some, and he took Tylenol or Advil for the pain. The plaintiff stated that he could not stand for too long and had to elevate his feet to ease his pain. He could manage his personal care, but it took him longer than most people. It took him about two hours to get dressed in the morning. He could drive, did chores if he had to, but did not cook. The plaintiff felt his pain in his right foot was more severe due to driving (Tr. 232).

On February 8, 2011, the plaintiff visited the Franklin C. Fetter Family Health Center, complaining of increased painful and itching skin, which he said was a lifelong issue. He was prescribed a different cream and referred to a different dermatologist (Tr. 236). On March 1, 2011, the plaintiff returned to the center complaining of pain in the legs and a rash on the hands. It was noted that he saw a dermatologist at MUSC, but was displeased with that doctor and wanted to see someone else. Assessment was eczema and a mild steroid taper was prescribed (Tr. 235).

On March 22, 2011, the plaintiff visited Daniel Bates, M.D., at West Ashley Family Medicine for a consultative examination (Tr. 238-40). He reported that he had suffered from eczema since he was child, but that it had worsened in the past 18 months. He also complained of pain and swelling in his feet. The plaintiff stated that he could walk for five minutes, stand for twenty minutes, and sit indefinitely. He reported having no difficulty with stairs; slight problems with gripping; and no problems with overhead lifting.

7

He reported needing no assistance with eating, dressing, or bathing and stated that he drove and completed light housework and some cooking (Tr. 238). Dr. Bates noted swelling of the plaintiff's legs that were tender to palpation.. The plaintiff had normal range of motion and stability (Tr. 240). Dr. Bates observed lichenified areas of skin on the plaintiff's extremities; smooth and shiny skin on the lower legs; scattered papules; occasional pustules; hypopigmented areas on the upper and lower extremities; and dry skin elsewhere. Diagnoses were atopic dermatitis and related conditions, hypertension, congenital pes planus (flat feet), enlargement of lymph nodes, and edema (Tr. 240).

On April 22, 2011, the plaintiff visited Dr. Davis, complaining of a rash for the previous four months. Examination showed lichenified areas on the skin. Impression was atopic dermatitis. Dr. Davis's notes are barely legible, but he appears to have prescribed steroids (Tr. 253). Dr. Davis wrote another prescription on June 3, 2011 (Tr. 254).

On March 24, 2011, Angelo Saito, M.D., reviewed the plaintiff's medical records and assessed the plaintiff's physical residual functional capacity ("RFC"). The doctor noted that skin dermatitis was the plaintiff's primary diagnosis. Dr. Saito opined that the plaintiff retained the ability to lift and/or carry up to twenty pounds occasionally and ten pounds frequently; to stand and/or walk for about six hours in an eight-hour day; and to sit for about six hours in an eight-hour day. The doctor opined that the plaintiff could only frequently operate foot controls, due to reports of pain and swelling in the feet (Tr. 242). The doctor opined that the plaintiff should never climb ladders, ropes, or scaffolds, and should only frequently perform other postural activities such as balancing or stooping (Tr. 243). The doctor opined that the plaintiff should avoid even moderate exposure to extreme heat, wetness, and humidity (Tr. 241-48).

On July 15, 2011, Cleve Hutson, M.D., reviewed the plaintiff's medical records and assessed the plaintiff's physical RFC. Dr. Hutson opined that the plaintiff retained the ability to lift and/or carry up to twenty pounds occasionally and ten pounds frequently; to

stand and/or walk forat least two hours in an eight-hour day; and to sit for about six hours in an eight-hour day.  The doctor opined that the plaintiff could only frequently operate foot controls, due to reports of pain and swelling in the feet.  The doctor opined that the plaintiff should never climb ladders, ropes, or scaffolds, and should only occasionally climb ramps or stairs.  The doctor further opined that the plaintiff should only occasionally perform other postural activities such as kneeling or stooping, though he could frequently balance, and the plaintiff should avoid even moderate exposure to extreme heat, wetness, and humidity (Tr. 255-62).

At the June 2012 hearing, the plaintiff appeared with his attorney (Tr. 20-35). He testified that he earned a college degree in accounting and had previously worked as a telemarketer, a stocker and meat grinder in a grocery store, and a car salesperson (Tr. 24-25).

The plaintiff stated that he could not work because of eczema and swelling of his ankles, making it difficult for him to walk.  The plaintiff testified that his eczema caused skin cracking and made it difficult to shower.  He stated that he took pain medication to deal with the eczema pain (Tr. 26).  The plaintiff testified that he experienced skin shedding and found it embarrassing to be around people.  The plaintiff testified that steroids had been very effective in treating his eczema, but had become increasingly less effective.  He stated that his ankles had become so swollen that he could no longer drive (Tr. 27).  Where the steroids had previously made him feel better for up to six weeks, they currently made him feel better for only two weeks (Tr. 28).  The plaintiff testified that he spent two hours in the morning getting his skin ready for the day.  He testified that he had a hard time walking and had recently tripped on the stairs.  He stated that sometimes he could not go anywhere because his feet hurt, and he had to lie down to take the pressure off his ankles (Tr. 29).

The plaintiff stated that he had last been seen at MUSC about a month earlier after suffering a fall and breaking his finger (Tr. 29). He had also been seen at the East Cooper Community Outreach clinic, which was free. He said "you got to go there and hope they'll see enough people that you can actually get seen. You might go there and sit outside." Sometimes he had gone and not actually seen a doctor. Because of this, he started going to the emergency room.

The plaintiff stated that in June 2009, his alleged onset date, his skin became a nightmare and itched constantly (Tr. 31). He thought that he had probably gone to a community outreach clinic on his alleged onset date, but stated that they do not keep good records there (Tr. 30-31). The ALJ noted that the first dermatological records she had were from January 2010 (Tr. 31).

The ALJ asked the vocational expert to assume a person of the plaintiff's age, education, and past work experience, who could lift and carry up to twenty pounds occasionally; sit for at least six hours in an eight-hour day; stand and walk for two hours each in an eight-hour day; frequently use his lower extremities for foot controls; never climb ladders, ropes, or scaffolds; only occasionally climb ramps and stairs; only occasionally stoop, kneel, crouch, or crawl; must avoid concentrated exposure to extreme heat, wetness, and humidity; and must avoid face-to-face contact with the public. The vocational expert testified that such an individual could perform the plaintiff's past work as a telemarketer (Tr. 33).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) failing to explain why his lymphadenopathy and edema were not severe impairments in the step two findings and (2) finding that his impairments did not meet the criteria of Listing 8.05.

*Severe Impairment*

The ALJ determined that the plaintiff's sole severe impairment was dermatitis (Tr. 12). The plaintiff argues that the ALJ erred by failing to find that his lymphadenopathy and edema were severe impairments at step two of the sequential evaluation process. A severe impairment is one that significantly limits an individual's ability to do basic work activities. 20 C.F.R. § 404.1520(c). Impairments having only a minimal effect on basic work activities are not severe. *See Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984).

The plaintiff was diagnosed with "inguinal lymphadenopathy" (meaning swelling of the lymph nodes surrounding the groin) and showed evidence of edema in the lower extremities (Tr. 222, 230). The Commissioner argues that the plaintiff did not allege that swelling in the lymph nodes in his groin resulted in any functional limitation, and thus the ALJ did not err in determining it was not a severe impairment (def. brief at 9). The plaintiff argues in response that he complained of "pain and swollen glands" when he presented to Mount Pleasant Dermatology in January 2010 (pl. reply at 1 (citing Tr. 222-23)). The office note cited by the plaintiff states that the plaintiff had an "itchy rash to full body" and "Pt. notes 'in pain' and 'glands' are swollen for 3-4 months" (Tr. 222). There is no indication that the pain complained of by the plaintiff related to his swollen lymph nodes. Further, as argued by the Commissioner, when the plaintiff was asked by the ALJ at the hearing to describe why he was unable to work, he testified that pain caused by his eczema and the swelling in his ankles caused his inability to work, and he did not mention his swollen lymph nodes (Tr. 26-31). Based upon the foregoing, the undersigned finds that the ALJ did not err in determining the plaintiff's inguinal lymphadenopathy was not a severe impairment.

As to the edema, the ALJ specifically considered that "there was evidence of pitting edema" in the plaintiff's lower extremities and noted his testimony that standing all day resulted in ankle pain (Tr. 13-14). The ALJ also gave "considerable weight" to Dr.

Hutson's medical opinion (Tr. 14), in which the doctor noted that "pain and swelling" in the plaintiff's feet would limit him to only frequent use of foot controls (Tr. 256). The ALJ concluded that the plaintiff's impairments – both severe and non-severe – caused functional limitations in the plaintiff's abilities to stand and use foot controls (Tr. 13). In light of this conclusion, the ALJ limited the plaintiff to less than a full range of sedentary work, with only occasional use of foot controls (Tr. 13).

The plaintiff does not point to any evidence that edema in his lower extremities caused limitations beyond those accounted for in the RFC (pl. brief at 8). If an ALJ commits error at step two, it is rendered harmless so long as the ALJ properly concludes that the claimant cannot be denied benefits at step two, but rather continues to the next step of the sequential evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that any error at step two of the sequential evaluation process becomes harmless if the ALJ "reached the proper conclusion that [the claimant] could not be denied benefits at step two and proceeded to the next step of the evaluation sequence"). Here, the ALJ specifically included limitations related to the plaintiff's edema in the RFC finding, and the findings are supported by substantial evidence. Accordingly, any allegation of error in this regard is harmless.

***Listing 8.05***

At step three of the sequential evaluation process, the ALJ determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listing 8.05 (Tr. 13). The plaintiff argues that the ALJ failed to conduct a proper analysis with regard to Listing 8.05 (pl. brief at 8-10).

An individual's dermatitis meets Listing 8.05 when it causes "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 8.05. "Extensive skin lesions" are those that "involve

multiple body sites" and result in "very serious" limitations: for example, lesions that "interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity," or lesions occurring on the palms of both hands or the soles of both feet. *Id.* § 8.00(C)(1)(a)-(c).

In her discussion, the ALJ explained that although the plaintiff had a history of eczema since childhood, there was "no evidence of extensive skin lesions that have persisted for at least 3 months despite continuing treatment as prescribed" (Tr. 13). She further noted that the "medical evidence documents mostly 'lichenified' areas and dry skin, not specifically lesions" (Tr. 13). The plaintiff argues that the ALJ's listing analysis is flawed because "[t]he term 'lesion' refers broadly to an abnormal change in the structure of an organ or body part caused by injury or disease" (pl. brief at 8 (citing http://merriam-webster.com/dictionary/lesion)). As pointed out by the plaintiff, "papules," "plaques," and "pustules" are types of primary lesions, while "lichenification" refers to a thickening of the skin in response to repetitive scratching and is referred to as a secondary lesion.[3] Thus, the plaintiff argues that the ALJ erred in her analysis of the listing.

The undersigned finds that while the plaintiff is correct that lichenified skin may be a type of lesion, the ALJ nonetheless reasonably determined that the plaintiff's did not have "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed" as required by Listing 8.05 (Tr. 13). Specifically, the ALJ noted (Tr. 14) evidence that the plaintiff's skin condition improved with topical and oral treatment in January 2010 (Tr. 220), that an April 2010 examination revealed only "a few" papules and plaques, with no evidence of infection (Tr. 230), and that the plaintiff was repeatedly

---

[3]*See* http://www.merckmanuals.com/professional/dermatologic_disorders/approach_to_the_dermatologic_patient/description_of_skin_lesions.html and http://www.pediatrics.wisc.edu/education/derm/tutb/lichenification.html.

noncompliant with his topical skin treatments, despite the fact that he reported improvement when complying with treatment (Tr. 222, 230).[4]

The plaintiff argues that he has presented evidence that his condition lasted three months despite following prescribed treatment based on the consultative examiner's notation in March 2011 that the plaintiff's "quiescent periods have been getting shorter and shorter" (pl. brief at 10 (citing Tr. 238)). The notation by Dr. Bates was apparently based on the self-report of the plaintiff, as the only medical records Dr. Bates had for review were from January 6 and 20, 2010 (Tr. 238). Those records show that on January 6, 2010, the plaintiff reported that his skin condition was worsening. However, it was also noted that the plaintiff had not been compliant with prescribed treatment (Tr. 222). Two weeks later, on January 20, 2010, the plaintiff reported that he had been using the prescribed treatment and that his eczema was improving (Tr. 220-21).

The plaintiff also argues that the ALJ erred in failing to find that his impairment was medically equal to the listing because of his "frequent flare-ups" (pl. brief at 10 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 8.00(C)(2))). Given the evidence cited in the ALJ's decision regarding the infrequency of the plaintiff's medical treatment, his noncompliance with topical skin treatment, and the reported improvement in the plaintiff's condition when he did follow treatment, the undersigned finds that the ALJ's determination that the plaintiff did not meet or medically equal Listing 8.05 was based upon substantial evidence and was without legal error.

---

[4] As pointed out by the plaintiff, the ALJ mistakenly stated that Dr. Bates observed "no lesions" during a March 2011 examination, when in fact he observed "scattered papules" and the "occasional pustule" (Tr. 14; see Tr. 240).

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

                                              s/ Kevin F. McDonald  
                                              United States Magistrate Judge

September 10, 2014  
Greenville, South Carolina